The two cases are scheduled for double the time of the last three. That's sort of a fortuity or a happenstance. It doesn't really mean they require twice as much time as the other three. So please keep in mind, don't feel a necessity to fill up the 20 minutes. The odds are the case can be argued in considerably less time. We have read the briefs and the record, and they really are, as you may have noted, fairly familiar with the cases. So we would appreciate it if you'd try to hold the argument to a reasonable amount of time. Thank you. Good morning, Your Honor. I may have pleased the Court. I'm Daniel Snyder. I represent the plaintiffs for the appellants in this matter. This is the appellant's appeal from the district court's decision to grant summary judgment, both on the Section 1983 claim and on the Penance Day claim. Your Honor, I'm sure that you're familiar with the facts, but what I would like to draw the court's attention to is that the district judge, deciding that there was not protective expressive conduct under the 1983 claim, analyzed only my client's testimony at the Employment Relations Board hearing involving the county and the union, and did not address his affidavit, the subpoena that was issued to him, and his witness statement in the subsequent United States District Court Title VII case involving Mr. Stevens. And that should have been analyzed because that was also protective expressive conduct. With regard to the testimony of Mr. Obrist before the Employee Relations Board in the spring of 1999, the court seemed to focus upon the cross-examination that was conducted by the union's attorney, in which Mr. Obrist acknowledged that he also had issues with Multnomah County that he was considering. However, what the testimony does not touch upon is the fact that Mr. Obrist appeared under subpoena, that he stated in his direct examination, and I'm referring, Your Honor, to the supplemental excerpt of record in which the full extent of his testimony is set forth, that he regarded those as separate matters, and his concluding remarks that he had testified honestly. So I think, Your Honor, that one of the mistakes that was made in this case was in the district judge concluding that this testimony by Mr. Obrist concerned a private matter rather than a matter of public concern. Let me ask you, in the context of his testimony, the employee relationship, the case agreement case, as opposed to the federal suit, was that a claim of racial discrimination also? Yes. In the supplemental excerpt of record, Your Honor, you have a copy of that complaint. The issue in the case was whether the individual who filed the complaint was being discriminated against because of his race, and he was a witness in favor of that individual. I'm sorry, Your Honor, I was opening the excerpt of record. I said in the grievance procedure, or whatever the complaint was for the board, The allegation was that the individual was being discriminated against because of his race? The word race was not mentioned. Instead, and I'm referring to supplemental excerpt of record, page 38, what he said was the charges of falsifying audits relied in part on information provided, I should say, by Judy Swenson and Diane Hanson, two county employees who were openly hostile to complainants, before the allegations were made. And the testimony at the hearing touched on issues of age and racial discrimination, but that particular bit of testimony is not before the court in the excerpt of record. Mr. Obrist came in to testify because we alleged in the Stevens case before the Employees Relations Board that my client had been targeted by these two individuals, Swenson and Hanson, who claimed that he had taken too long to perform certain weatherization audits. Mr. Obrist came in to testify about the amount of time it would take to perform the weatherization audits. So the question I'm trying to find out is why? It's one thing if your client, your other client, was being singled out by these people because they didn't like them, and there was an ordinary grievance going on about internal problems in the workplace. They didn't like the way, you know, his attitude. So they singled him out. It's another question if they singled him out because of his race or his age. Certainly, and I believe I just misspoke, Your Honor, inadvertently. There was an allegation in the complaint that there was racial discrimination, and I refer you to Supplemental Excerpt of Records, page 39, in which we allege in paragraph H, in failing to investigate whether complainant had been singled out for investigation, whether investigations had been focused on employees who, like complainant, were over 50 years of age or were African-American, had disabilities, or whether other co-workers had failed to protect them. And his testimony in the hearing related to the fact that, in effect, the charges that they were slow or something like that were pretext because that was the way everybody was. Mr. Overs did not use the word pretext, but I presented his testimony for that reason. He testified as to the amount of time that it would take to perform certain tests, which were consistent with how long it took my client to perform the tests. And which was the basis of the county saying, well, you were too slow. And Mr. Overs says, well, this is not true. So that was not the real reason, was his testimony. His testimony was to establish that that was not the true reason for their saying that he was slow. Yes, Your Honor. I'm sorry. Let me turn to the more troublesome aspect of this case from your standpoint. And that is the record makes it pretty clear that long before your client, your client in this case, long before Mr. Overs testified in either the employee grievance process or submitted an affidavit in the criminal suit, long before that occurred, he had the same complaints about these individuals. In fact, there may have been merit to the complaints. And it resulted in a settlement of the dispute. And then it continued after the settlement of the dispute. The exact same kind of problem. These two ladies, according to him, did everything they could to stop him. Now, in the middle of their whole campaign against him over the years, came the fact that he happened to testify in an employee case and happened to file an affidavit in a federal case. What indication is there that the reason they continue to do what they have been doing before was because of the testimony? That's in the supplemental excerpt of record page 137. Well, I know they knew about it. Let's assume they knew about it. Somebody told him he had he had he had a filed an affidavit or was filing. What what other than the fact that they continue to retaliate, continue to treat him badly after this happened. What is there other than that that shows it was not simply a continuation of their past? Well, he testified in his deposition. And that's in the supplemental record, page 137, that the escalation of things being said about his company and his employees happened after the Curtis Stevens incident. And secondly, after the new contract went into effect, that is after the settlement that he achieved with his prior attorney, he did not receive assignment of any work from the company. In fact, not until just a few months before the county filed a summary judgment decision, did he receive one or two jobs. And he had been receiving work under the prior contract, the 1996 contract that was in effect essentially from 1996 through June of 2000. Well, he had been, but it had been so small that he had filed a complaint and it was settled. He was given $14,000. So some of them because they had not been giving him enough. That's true. And about 1997, he got about $50,000 work. It went down dramatically in 98 when he hired a lawyer that gave him about $19,000 work in 99. And then after that, he didn't receive any. They continued to do what they've been doing. Admittedly, Your Honor, they've not treated him well. I'm assuming that for purposes of summary judgment. But it seems like it became dramatically worse after the fall of 99 when he was listed as a witness because he didn't receive any more business in 2000, 2001, 2002. And received one or two assignments in 2003. The thing is, I said that I think the most difficult is connecting that to the testimony because they did. It's true. They had they did a new contract. And again, we assume your facts. They tried to make an Oprah's proof or whatever his first name is. Right. So we assume that these two people that he was not getting on with very well or not much care for him. Put into the 2000 conditions that make it possible. The question is, did they do that because there is a substantial probability. This was a substantial part of that reason that he didn't. He just submitted the affidavit. Or is it because they were doing it before? And now they were really mad because he'd already sued them. Well. I think that there's evidence in this case. I'm not sure exactly what you're asking. I certainly didn't go from four hundred thousand dollars to zero. He went from 19 or 20 thousand dollars to zero. But it's still money. I don't think the county county's employee, the county and its employees should be excused from what appears to be a very purposeful agenda that they had of signaling him out and saying we're not going to give him any business. And we hope his business fails. I'm not suggesting they should be excused. Well, I'm asking is whether it was because of his assertion of his First Amendment rights rather than the fact that they just liked him all along and were particularly mad after he sued. Well, it was after he testified at the hearing and submitted his affidavit in the title seven case in preparation for the new contract that Diane Hansen said she was going to rob. Proof it. So those are the facts that we're working with. Are there any additional questions from the court? I'm not sure if I have any rebuttal time. Thank you. The court. Rather than than addressing my prepared statement, I'd like to address first a point that was raised during the dialogue with Mr. Snyder. In regard to the July 2000 contract, your Honor stated that Ms. Hansen and Ms. Swenson could do certain things to Mr. Obrist and Alpha under the terms of the July 2000 contract. But the record is very clear that the contract itself, although originated out of the weatherization department, initiated, moved towards the county attorney's office and the procurement department by Ms. Hansen. In fact, Ms. Hansen is an office assistant, and the contract itself was written by someone in my office, by John Thomas, an assistant county attorney, who has the skill and the expertise to write a contract as complex as the contracts in this case. There is absolutely no evidence in the record, other than Mr. Obrist's assumptions and speculations, that Ms. Hansen and Ms. Swenson had any impact on the terms and conditions of that contract, other than in regard to purely technical matters related to the technical things of weatherization programs. Well, what does it mean, then, when someone heard Hansen say she was going to rock-proof the contract? What does that mean? We don't know what it means. We know that somebody alleges that Ms. Hansen said that. We know that Ms. Hansen denies saying it. But we have some rejection, so we assume. Assume that it was said? Yeah. It was said. There are a lot of things in the record that are ascribed to Ms. Hansen as her having said them. Well, that's why we have a trial. That's right. However, it doesn't – I mean, there – I'm trying to remember. There is a line of cases that says that mere bad-mouthing someone doesn't necessarily mean that there is a violation. Yeah, well, she doesn't say he's a louser, he's no good guy, or – Well, there are those allegations, too, that – But that they're going to fix the contract so that he can't work. But she had no power or authority to carry forward on that threat. I mean – Well, perhaps not in fixing the contract, but perhaps she did with regard to implementing the contract thereafter. And if the – if we take the rob-proof statement at face value, it suggests that she's motivated to do that, even if she can't do it in the written form of the contract. But there is no evidence in the record showing that she did that. The evidence shows that Cecile Pitts was the manager of that department, that she had final authority over the work orders, that she reviewed those work orders. There are no documents in the record at all that have Ms. Hansen's name on it, where she is in any position of authority or responsibility in terms of – Who decides in the first instance who's going to do a given job? Excuse me, Your Honor? Who decides in the first instance? You said Ms. Pitts reviews them, but who prepares what's put in front of her? The way the system works is that there is first a field audit, then there is a file desk audit back in the office. Once the terms of the work order are determined, then it is Ms. Hansen's job to enter that – Who is the lowest bidder? That information then and that entire file is set to Ms. Pitts, who then reviews those files. So she has final review over both the scope of the work and review over determining whether or not it is in fact the lowest bidder. And that was her responsibility, to make sure that under the terms of the contract, that that work was going to the lowest bidder. Is that the system that was in effect during the entire period and going into the earlier years, prior to 2001? No, the weatherization program has, in terms of record keeping, has been a constantly evolving and changing and improving type of system. And that is why in February 2000, the county and Mr. Obrist entered into a settlement agreement, because John Thomas of county attorney's office determined after investigating a claim that was made by Mr. Obrist, that in fact there was a problem with the contract and that there had been slip-ups and that there was work that should have been assigned to Mr. Obrist that he did not receive. Not because it was intentional, but because just there was an error made. Maybe I've got you off on a tangent, because I don't understand the district court's summary judgment to be based on a conclusion that after the date, I've forgotten what date the release was effective, but during the time period in question where we have the current lawsuit, that the jobs always went to the lowest bidder and so there was no discretion being applied here. That's not what the district court said, was it? The district court threw this case out for reasons other than the facts line up perfectly to say there can't be a claim. I agree, Your Honor. However, in that part of the opinion, Judge King says at the very beginning that the county and the county did in fact file a very lengthy motion to strike. Numerous affidavits and documents that were submitted by the plaintiff in opposition to the motion for summary judgment. He only ruled on those parts of the motion to strike that were relevant to his decision. His decision was limited to the issue of the speech and not to the issues dealing with whether or not there was adverse action taken. So that's really, we don't get to the question of whether there was adverse action. We have to assume there was because it's thrown out solely because it's not a First Amendment. Well, I don't think, I would argue that we do not assume that there was because in fact, I think that the county has shown in its motion that there was no adverse action taken. We'll go back to Judge King who might then reach that part of the motion. When I say we assume, I don't mean the whole world does. I mean for purposes of this appeal. And if by some odd stroke of fate you were to lose this appeal, you would then be back before Judge King and reasserting that and asking him to reach those questions. Exactly, Your Honor. However, I don't think that we need to go back to Judge King because I don't think that the speech in this case is protected. Recently in, just in March, this court in Sebelius v. Carcetti, that's 361 F. 3rd, 1168, again reiterated that in determining whether or not a public employee's speech, or in this case an independent contractor's speech, is on an issue of public concern, you have to look at what was the point of the speech. Why was that person there talking out? Was the person there talking out because the person was motivated to be a concerned citizen, bringing to light wrongdoing, or was that person there purely for a private interest? Well, does it have to be his interest? I thought I understood the plaintiff's position to be he was there because he was subpoenaed. No, I think you have to look at the content, form, and context of the independent contractor's speech or the public employee's speech, and that certainly is the way that this court analyzed it in Rendish v. City of Tacoma. Let me ask you a question, please. You know, these, no matter what you say in the preceding opinion, as you know, I'm fairly familiar with superiors. You know, the next case comes along and you then wonder about the privacy. I wanted to ask you, you say it's the motive of the person making the speech. If John Dean had gotten up and talked about all the things that Richard Nixon did, but it turned out the reason he brought that to the public's attention was not because he was subpoenaed, not because he was a citizen concerned about an evil president in the White House, but that Richard Nixon had spoken to him harshly and reprimanded him, and he wanted to get even. He was a disgruntled employee. And get a book contract. Of course. He's got to get the book contract. Would that mean that that speech was not protected by the Fifth Amendment when he exposed all the evils of Watergate? I think following this Court's decision in Rendish v. City of Tacoma, and the cases approved of by this Court in Rendish, in particular the Yatsen case, and following Judge King's decision, the Maggio case, that if it is, if the person is there speaking out because it is a matter of self-interest, purely for self-interest, then they are not there speaking out as a concerned citizen on a matter of public concern. Well, it's partly self-interest and partly not. Then I think what Rendish seems to indicate to me is that Rendish talks about there being four different types of speech. In that case, in Rendish, the district attorney spoke out about a judge, spoke out in a disability discrimination case, spoke out about alleged improper disposition of criminal cases in favor of friends and city workers, and spoke out because she was being challenged because she had supported a challenger to a sitting judge's position. The Court, in analyzing that speech, doesn't give it a carte blanche just because these appear to be matters of public concern. What the Court says is that you have to balance. You have to balance. And here, in this case, there — In Rendish, didn't it find that the speech was a matter of public concern, but then it applied a tickling balancing test and found that somehow it would be more disruptive to the city because it would cause an internal chaos or something. Whatever the merit of that balancing analysis they did, they didn't say that the speech was not a public concern. The speech was. Here we're not at a balancing question. We're only at the first question, which Rendish would seem to have reached the conclusion that your opponent wants us to reach here. I understand what you're saying, Your Honor. But what I am saying is that in Rendish, the Court goes through a fairly lengthy analysis of a public employee speaking out based on the First Amendment and then speaking out under the Petition Clause, and comes to the conclusion that the standard for the Petition Clause and for First Amendment is the same, that the employee has to be speaking out on a matter of public concern. In going through that analysis, they favorably look at Yatsen. And Yatsen is a case involving sex discrimination, where somebody has spoken out about sex discrimination, clearly could be a matter of public concern. But Rendish adopts the position that when it is a run-of-the-mill discrimination case, you're not necessarily entitled to First Amendment protection. This is not, as the Court says, quoting from Connick, this is not the same type of case as the NAACP bringing a broad-based systemic type of discrimination claim. And, in fact, when Rendish analyzes the speech of the district attorney, what they are concerned about is that she is talking about in her speech systemic problems rather than one personal problem. And it is very distinguishable from the facts in this case because here it does not appear that Mr. Obrist, any of his speech has to do with race discrimination or with ‑‑ Well, I don't understand. I still don't understand how Rendish helps you on that. I think Judge Reinhart is exactly right because I found it in Rendish. The Court's conclusion there is it involves matters of public concern. Right. It goes on to the second question and gets a different conclusion. Right. But what is it here that makes testimony about alleged discrimination by the county something not a subject of public concern? Because the difference is in Rendish what they are talking about is that what she is bringing to light are systemic problems. They focus on the fact that one of her allegations that the district court even thought might be a matter of public concern was the alleged improper disposition of criminal cases. And it was in total ‑‑ If it's the alleged improper disposition of a single criminal case, that wouldn't be enough. It has to be a consistent practice in the Department of discriminating. I'll read a sentence from Rendish. Rendish alleged the city refused to hire Bass because of her disability and testified in Bass' discrimination suit against the city. Semicolon. The public has an interest in unlawful discrimination by the city. No requirement that 17,000 people be discriminated against. That's one case. I understand, Your Honor. But I think that the Court said that after saying we conclude on balance that the speech is on matters of public concern and then goes through the list of describing why those are a matter of public concern. Well, is there any authority that supports the proposition that testifying in a single case for somebody else or somebody else's alleging discrimination is not ‑‑ I would argue that Rendish takes that position. Well. And that it is the totality of the speech in Rendish that allows the Court or leads the Court to the conclusion that it's on a matter of public concern. When they are discussing, though, other cases that only raise an issue of discrimination, they approve of the decisions. They approve of how the Seventh Circuit decides the Yadvin case. There's a lot in this opinion, unfortunately. Yes. I mean, it covers a lot of territory. It says a lot of different things. But it's not so clear what the Seventh Circuit meant then. And since then, they said we wanted to make it clear we're not saying that a single case of discrimination is not enough. And if you go back to the subpoena, you'll find that was a single case of a detective complaining about an act by a detective in one particular case. And we said that was enough. But I understand why you find some comfort in our apparent approval of at least part of the entries. But I wouldn't take all that much comfort from it. It's not only that, Your Honor. But I don't think that there is First Amendment protection for an employee or for an independent contractor who is speaking out but is not speaking out as a concerned citizen. In this case, the evidence shows very clearly that Mr. Obrist was totally self-motivated. And, in fact, at the EIRB hearing, he is he does not appear to even understand what that it is perhaps there's underlying race discrimination claims. And, in fact, he says that he believes and I think. Well, let's accept that being true for the moment. That takes us right back to the question that Judge Reinhart asked about John Dean. Because motivation may not it may be indicative but also may not track exactly with public concern. If John Dean had purely selfish motivations, does that make his testimony any less of public interest, of public concern? But there what you're saying is that the matters on which he's speaking are matters of public concern. In this particular case, if you took the EIRB testimony, the witness statement, and the affidavit submitted by Mr. Obrist and published them tomorrow in the front page of the Oregonian, I don't see that that would raise any concern for the public in terms of the operation. There's nothing in there. How about if you publish them along with the rest of the court proceedings where the plaintiff is saying, I was treated badly because I'm black. And then you say the city says, no, it's because he never turned off the faucet. And then we have Mr. Obrist coming in and saying, they don't treat. They don't fire you for not treating off the faucet. He rebutted the city's explanation, and he gave a complete lie. He put the lie to what the city said. Would that be a public concern? Well, then you would be ascribing the trial and litigation strategies of the plaintiff's attorney to a matter of public concern for Mr. Obrist. Well, we're looking at it the way Judge Clifton suggested, not what did he have in mind when he made the statement, but what is the public interest in that statement? Is that a statement that would interest the public, that is of concern to the public? Mr. Stevens' statements may be a matter of public concern, but Mr. Obrist's statements are not a matter of public concern. If he had testified that the county was not awarding contracts to low bidders, that they were not awarding contracts to contractors who were qualified to do pressure balancing, which is somewhat of a high-risk type of activity, to qualified contractors, then perhaps his speech would be on a matter of public concern. But I don't think that he gets to bootstrap that he is a concerned citizen by just being kind of involved in a discrimination case. All right. Thank you very much. I would like to address two points raised by the county and the defendants. First of all, they claim that Ms. Hansen and Ms. Swenson were not decision-makers and that Cecile Pitts was the decision-maker, and that is contrary to the evidence in this case, specifically the affidavit submitted by their coworker, Mr. Lutz, who said that he has seen Hansen and Swenson make changes to the job orders and to manipulate the system and to take names of contractors in and out of the system so that contractors are not awarded work and that he has seen them tamper with files and change low bid sheets. Pitts is simply there to rubber stamp what Hansen and Swenson do. Also, with regard to the county's contention that my client's testimony does not concern a matter of public interest, it ignores the affidavit that he submitted in connection with the Title VII case, which is Supplemental Excerpt of Record 65, in which he says, I have observed that Ms. Swenson and Ms. Hansen are very biased towards Mr. Stevens. Both Ms. Hansen and Ms. Swenson work towards the goal of getting Mr. Stevens out of the weatherization department. If Mr. Obrist's, if we're going to look at Mr. Obrist's self-interest, his self-interest would have clearly been not to have gotten involved at all in Mr. Stevens' matter because it could only result in the reduction of work to him. In other words, if there's some allegation here that he got involved in the Stevens' matter to enhance his self-interest, it certainly backfired. Thank you. Thank you, sir. Thank you, sir. It is very important to take a brief recess before the final two cases. Good morning. All rise. We'll stand in recess for five minutes. Thank you.
judges: Reinhardt, Silverman, Clifton